UNIROYAL, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 80-1-00073

Before DiCARLO, *Judge.*

(Decided April 5, 1985)

*Barnes, Richardson & Colburn* (*Andrew P. Vance* and *Michael A. Johnson*) for the plaintiff.
*Richard K. Willard,* Acting Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office (*Susan Handler-Menahem*) for the defendants.

DiCARLO, *Judge:* Plaintiff challenges the United States Customs Service's (Customs) classification of canvas uppers for high-top sneakers, or "basketball shoes", imported from Indonesia.

The merchandise was classified under item 386.04, Tariff Schedules of the United States (TSUS), as "Articles not specially provided for, of textile materials * * * and other articles ornamented * * * Of Cotton" at a rate of duty of forty percent ad valorem. Plaintiff seeks reliquidation under item 386.50, TSUS, as "Articles not specially provided for, of textile materials * * * Other articles, not ornamented * * * Of cotton * * * Other" at 14 percent ad valorem.

The parties stipulated that (1) plaintiff timely protested the classification and paid all liquidated duties, and the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a); (2) the imported articles are white, or natural canvas (off-white), high-top sneaker uppers; (3) attached to the inside exterior of each upper is a "patch", *i.e.,* a white textile circlet, attached by glue or resinous substance, on which is printed a blue or red circle within which is the "Pro-Keds" brand name, with horizontal blue and red lines under the name, and with a vertical red line next to the "P"; and (4) when the finished shoe is worn, the fabric on which the patch is placed covers the bony outcropping of the ankle.

The question presented in this case is whether the ankle patches make the canvas uppers "ornamented" within the meaning of schedule 3, headnote 3 of the TSUS, which reads in part:

(a) *the term "ornamented"*, as used with reference to textile fabrics and other articles of textile materials, *means fabrics and other articles of textile materials which are ornamented with—*

\*     \*     \*     \*     \*     \*     \*

(iii) lace, netting, braid, fringe, edging, tucking, or trimming, or *textile fabric;*
\* \* \* or
(v) any combination of the foregoing types or methods of ornamentation; [emphasis added].

In *Blairmoor Knitwear Corp. et al.* v. *United States,* 60 Cust. Ct. 388, 392, C.D. 3396, 284 F. Supp. 315, 318 (1978), the Court observed that:

> while the Headnote \* \* \* purports to define the term "ornamented", it does not actually do so. Instead it sets forth the circumstances under which fabric and articles may be considered to be ornamented, and the type of embellishments which may accomplish that effect \* \* \*.
> \* \* \* it remains to be determined what constitutes ornamentation in the first instance.

In determining whether an article is "ornamented" within the headnote, the Court of Customs and Patent Appeals asked whether the feature is "primarily ornamental or functional" and whether the function is appropriate to the use of the article. *The Ferriswheel* v. *United States,* 68 CCPA 21, 25–26, C.A.D. 1260, 644 F.2d 865, 867–68 (1981).

Also, in *United States* v. *Endicott Johnson Corp.,* 67 CCPA 47, 50, C.A.D. 1242, 617 F.2d 278, 281 (1980) the appellate court commented:

> The first question is: Does the addition of [the feature] impart no more than an incidental decorative effect? The next question is: [Does] the [feature] have a functionality which is primary to any ornamentative nature? An affirmative answer to either results in a nonornamental classification.

*See also The Baylis Brothers, Inc.* v. *The United States,* 56 CCPA 115, 117, C.A.D. 964, 416 F.2d. 1383, 1384 (1969) (is the feature "*primarily ornamental,* though it may serve an incidental useful function"? (emphasis in original); U.S. Tariff Comm., *Tariff Classification Study, Explanatory and Background Materials, Schedule 3,* 7 (1960) (headnote applies only if "such materials were used primarily for ornamentation").

At trial, plaintiff introduced evidence to show that the ankle patch had three functions: it provides abrasion resistance for the underlying fabric, protects the ankle bone, and controls pronation.

In a deposition, Richard B. Crosbie testified that the ankle patch controls pronation, the inward tipping of the ankle, "to a degree" by stiffening the fabric around the ankle. However, the Court finds more persuasive the testimony of defendant's witness Richard Bunch, manager of the biomechanics laboratory at Converse, Inc. and author of several published articles on the relationship of sports injuries and sports shoes, who testified that the patch provided no such support because the area of the ankle where pronation occurs is well below the patch. Plaintiff does not argue in its post-trial brief

that the patch serves any function with respect to correcting pronation, and the Court finds that plaintiff has failed to prove that it does.

Plaintiff's witness also testified that the patch protects the bony outcropping of the ankle from injury, but there is little in the record to indicate how the patch serves that function. Nor is there any credible evidence that this area is in need of protection. The Court finds plaintiff's evidence insufficient to prove that the patch protects the ankle from injury.

The only question remaining is whether the patch primarily serves to protect the underlying fabric from abrasion. The Court finds that it does not, and that the patch is primarily ornamentive.

Witnesses for both parties agreed that they had seen scuffing on the ankle patch on shoes returned from wear tests. Although all the witnesses agreed that the patch strengthened the underlying fabric, there was little credible evidence that if the patch were not on the upper there would be abrasion of the fabric or deterioration of the upper.

Defendant's witness Daniel McCarthy testified there is no extra wear in the ankle area of the upper when the sneakers are used for playing basketball. Mr. McCarthy testified that Converse manufactured and marketed a high-top sneaker without the ankle patch, and that he did not see any particular wear in the ankle area in sneakers without the patch. Mr. Bunch, defendant's biomechanics expert, testified that basketball players do not frequently strike their ankles together as they play, and that he had never seen wear in the area of the ankle patches, even on high-top sneakers without ankle patches.

Witnesses for both parties testified that ankle patches had been placed on the exterior inside surface of plaintiff's high-top sneakers since the 1920's; that the patch was originally made of leather backed with sponge; that in the 1940s is was made of a thick rubber; and that the patch was always placed on the same area on the shoe. Defendant's witness McCarthy testified that the patch was intended to serve a protective purpose when originally placed on the high-top sneaker, but it later appeared that there was no need for this protection. He also said that the current cotton and resin patch was placed over the ankle area of the upper because the public expects to find a patch there. Plaintiff's witness Charles F. Welch admitted that plaintiff believed it could not successfully sell its sneakers without the patch, in part because its "major competitors had ankle patches on in the same place." Witnesses for both sides agreed the patch was colorful and attractive to the eye.

After considering the merchandise, other exhibits, testimony of record, and relevent case law, the Court holds that plaintiff has failed to overcome the presumption of correctness which attaches to Customs' classification that the uppers were "ornamented". *See* 28 U.S.C. § 2639(a)(1).

The action is dismissed. Judgment will be entered accordingly.